**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

<table>
<tr><td>KEITH KAPLAN</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td><b>CIVIL ACTION</b></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td><b>Civ. No.: 2:25-cv-16764 (EP)(JBC)</b></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td><b>FIRST AMENDED</b></td></tr>
<tr><td>TEANECK BOARD OF EDUCATION;</td><td>)</td><td><b>VERIFIED COMPLAINT</b></td></tr>
<tr><td>SEBASTIAN RODRIGUEZ, former</td><td>)</td><td></td></tr>
<tr><td>President, Teaneck Board of Education,</td><td>)</td><td></td></tr>
<tr><td>in his individual capacity; VICTORIA</td><td>)</td><td>FOR DECLARATORY,</td></tr>
<tr><td>FISHER, former Vice President, Teaneck</td><td>)</td><td>INJUNCTIVE, AND</td></tr>
<tr><td>Board of Education, in her individual</td><td>)</td><td>OTHER RELIEF,</td></tr>
<tr><td>capacity; ANDRE D. SPENCER,</td><td>)</td><td>42 U.S.C. §§ 1983, 1988</td></tr>
<tr><td>Superintendent of Schools, Teaneck Public</td><td>)</td><td></td></tr>
<tr><td>School District, in his official and</td><td>)</td><td></td></tr>
<tr><td>individual capacities; CLARA WILLIAMS,</td><td>)</td><td></td></tr>
<tr><td>Board Member, Teaneck Board of</td><td>)</td><td></td></tr>
<tr><td>Education, in her individual and official</td><td>)</td><td></td></tr>
<tr><td>capacities; and JOHN DOES 1–25,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

The plaintiff, Keith Kaplan, by and through undersigned counsel, Jablonsky Legal LLC d/b/a Madison House Legal Group, with knowledge as to his own acts, and upon information and belief as to all others, complains of the defendants as follows:

**STATEMENT OF THE CASE**

1.      Public schools serve families of every background and belief, but the First Amendment requires school officials to apply the rules of public meeting participation uniformly to all participants, supporters and critics alike.

2.      This is a civil rights action arising under 42 U.S.C. § 1983 for violations of Plaintiff Keith Kaplan's rights under the First and Fourteenth Amendments to the United States Constitution and Article I, Paragraphs 6 and 18 of the New Jersey Constitution in connection with

his participation in public meetings of the Teaneck Board of Education.

3.      The Board conducts public meetings at which members of the public are permitted to speak on matters of school district policy and community concern. Although these meetings constitute a limited public forum, Defendants have implemented and enforced public comment rules that grant officials broad and subjective discretion to interrupt, cut off, or restrict speech based on vague and overbroad criteria.

4.      On October 18, 2023, Mr. Kaplan and other speakers were interrupted and cut off while addressing matters of public concern, and Mr. Kaplan was ultimately prevented from completing his allotted public comment and removed from the lectern by law enforcement. In subsequent meetings, Mr. Kaplan was further warned, silenced, and chilled from fully participating in public comment, including through threats of exclusion and enforcement of selectively applied restrictions.  Following Mr. Kaplan's criticism of district officials, counsel for the Teaneck Board of Education sent Mr. Kaplan a letter warning him that he could be barred from future meetings if he failed to comply with the Board's decorum policies.

5.      Despite being placed on notice that these policies and practices were constitutionally infirm, Defendants declined to implement corrective measures and instead maintained and expanded discretionary enforcement of vague and overbroad speech restrictions.

6.      As a result, Mr. Kaplan's speech has been chilled, and he brings this action seeking declaratory, injunctive, and monetary relief for violations of his First and Fourteenth Amendment rights, and New Jersey Constitutional rights to free speech, petition, and assembly.

## THE PARTIES

7.      Plaintiff, Keith Kaplan ("Mr. Kaplan"), is a resident of Teaneck, New Jersey, and regularly attends and participates in public meetings of the Teaneck Board of Education.

2

8. Defendant, Teaneck Board of Education ("the Board"), is a district board of education formed pursuant to N.J.S.A. 18A:10-1 with offices in Teaneck, New Jersey.

9. Pursuant to N.J.S.A. 18A:11-1, the Board is empowered to make, amend, and repeal rules for its own government and the transaction of its business and for the government and management of the public schools and public school property of the district and for the employment, regulation of conduct and discharge of its employees, and to perform all acts and do all things consistent with law and the rules of the state board, necessary for the lawful and proper conduct, equipment and maintenance of the public schools of the district.

10. Defendant, Sebastian Rodriguez ("Board President Rodriguez"), is a former President of the Teaneck Board of Education, and in that capacity, controlled public comment at the Board's public meetings and acted under color of state law. He is sued in his individual capacity.

11. Defendant, Victoria Fisher ("Board Vice President Fisher"), was a former Vice President and member of the Teaneck Board of Education and acted under color of state law. She is sued in her individual capacity.

12. Defendant, Andre D. Spencer ("Superintendent Spencer"), is the Superintendent of Schools of the Teaneck Public School District, and at all relevant times, acted under color of state law. As Superintendent, Superintendent Spencer exercised supervisory authority over district operations, policies, personnel, and public communications relating to Board meetings and public participation therein. He is sued in his official and individual capacities.

13. Defendant, Clara Williams ("Board Member Williams"), was a former President and current member of the Teaneck Board of Education, and acted under color of state law. She is sued in her official and individual capacities.

14. Defendants, John Does (1–25), are persons presently unidentified who participated in, directed, enforced, or otherwise contributed to the unconstitutional acts alleged herein, and may include, without limitation, employees of the Teaneck Public School District and board members of the Teaneck Board of Education.

15. At all relevant times, the individually named Defendants, including John Does (1–25), acted under color of state law and within the scope of their authority as officials, employees, agents, and/or representatives of the Teaneck Board of Education.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and §1343 as this action challenges Defendants' violation of Mr. Kaplan's civil rights pursuant to 42 U.S.C. § 1983.

17. This Court has supplemental jurisdiction over Mr. Kaplan's state law claims under 28 U.S.C. § 1367.

18. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## STATEMENT OF FACTS

### A. The Board's Rules, Policies, and Practices Governing Public Comment

19. Pursuant to New Jersey's Open Public Meeting Act (N.J.S.A. 10:4-6 et seq.), the Board must provide members of the public with an opportunity to comment on school district matters at routine public Board meetings.

20. A Board meeting public comment period is, at a minimum, a limited public forum subject to First Amendment protections, during which the Board may impose only viewpoint-

neutral speech restrictions which are reasonable in light of the forum's purpose.[1]

21.     In March 2012, the Board adopted Bylaw 0167 ("the Policy"), which sets forth the guidelines for the public comment periods at Board meetings.

22.     The Policy, in relevant part, requires speakers to have a minimum of three minutes to provide a comment, and permits the presiding officer to "[i]nterrupt and/or warn a participant when the statement, question, or inquiry is **abusive**, **obscene**, or **may be defamatory**," and to "[r]equest any person to leave the meeting when that person does not observe **reasonable decorum**" (emphasis added). A true and correct copy of the Policy is attached hereto as <u>Exhibit A</u>.

23.     On November 27, 2023, a First Amendment non-profit organization, the Foundation for Individual Rights and Expression ("FIRE"), sent a letter (the "November 27th Letter") to the Board's attorney, Mark Tabakin, Esquire, to raise concerns about the constitutionality of the Policy and Board practices, following an October 18, 2023 meeting during which the Board interrupted Mr. Kaplan and other speakers. A true and correct copy of the November 27th Letter is attached hereto as <u>Exhibit B</u>.

24.     In the November 27th Letter, FIRE observed that the Board had engaged in viewpoint discrimination by interrupting speakers who were critical of the superintendent and that the Policy's terms were unconstitutionally vague and overbroad. FIRE offered to help the Board bring the Policy and its practices into constitutional compliance, free of charge.

25.     The Board did not accept FIRE's offer. A true and correct copy of correspondence from FIRE indicating the Board's lack of response is attached hereto as <u>Exhibit C</u>.

---

[1] *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 280 (3d Cir. 2004). Whatever type of public forum is created by the Board's public comment periods, it is well-established viewpoint discrimination is impermissible in *any* forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 60–62 (1983).

26.     On or around December 13 2023, the Board instead implemented new guidelines granting the President, or other presiding officer, more expansive powers to regulate public comment at Board meetings (the "New Guidelines").

27.     The New Guidelines permit the President, or other presiding officer, to interrupt or terminate a speaker's time if the comments are "excessively loud, profane, **vulgar, inflammatory,** threatening, **abusive,** or **disparaging** language or racial or ethnic slurs, disruptive, obscene, or otherwise in violation of applicable law" (emphasis added). The guidelines remain published on the Board's website. A true and correct copy of the New Guidelines are attached hereto as Exhibit D.

28.     Beginning on January 22, 2025, the Board published rules in the agenda (the "January Agenda Rules") which state, "[m]embers of the public are discouraged from speaking negatively about an employee or a student. Do not call an employee or student by name." A true and correct copy of the January Agenda Rules are attached as Exhibit E.

29.     Five months later, on June 11, 2025, the Board expanded its agenda rules (the "June Agenda Rules") to state, "[d]o not call an employee or student by name, otherwise the conversation will be discontinued." A true and correct copy of the June Agenda Rules are attached as Exhibit F.

30.     Three months later, on September 25, 2025, the Board removed from its agenda rules any prohibition on calling an employee or student by name. A true and correct copy of the agenda is attached as Exhibit G.

**B.  The Board's Selective Enforcement of Public Comment Rules on October 18, 2023**

31.     Mr. Kaplan is a resident of Teaneck who investigates and reports on local issues such as government affairs and finance, school district operations, elections, public safety, zoning

and development matters, and community and cultural events for his Internet publication, www.TeaneckToday.com.

32.    Mr. Kaplan also runs a Facebook group for Teaneck Today, which has approximately 16,800 members where members post daily about local issues and events. Thus, his reporting has considerable reach in the community.

33.    In addition to his reporting, Mr. Kaplan is generally known to the Board given his history of civic engagement and public service, including serving as Vice President of the Teaneck Planning Board and as a Teaneck Councilmember from 2018-2022.

34.    Mr. Kaplan has been and continues to be a regular participant at Teaneck Board of Education meetings, as his children previously attended Teaneck public schools, and he sources much of his reporting for Teaneck Today from his attendance and participation at these meetings.

35.    Following Hamas's October 7, 2023 attack on Israel (the "October 7th Attack"), Superintendent Spencer disseminated a public statement letter (the "Superintendent Statement"). A true and correct copy of the Superintendent Statement is attached hereto as Exhibit H.

36.    In the Superintendent Statement, Superintendent Spencer referred to the October 7th Attack as "the latest incidents in the cycle of violence in the Middle East," and also stated, "we recognize the fear, grief, and pain that our community is experiencing." He called for open dialogue to "gain a comprehensive understanding of the complex factors impacting our world" and offered counseling services for those affected by the events.

37.    Teaneck is home to a diverse population, with a reported 2018 estimate of 40% Jewish residents. A true and correct copy of the demographic report is attached hereto as Exhibit I.

38.    Since October 7, 2023, Jewish residents of Teaneck and Bergen County have

reported heightened concerns regarding antisemitism directed at visibly Jewish individuals and members of the local Jewish community.

39. According to the Anti-Defamation League's 2025 Audit of Antisemitic Incidents, New Jersey ranked third in the nation for antisemitic incidents, Bergen County accounted for the highest concentration of incidents in the state, antisemitic incidents in New Jersey were 68% higher than in 2022, and New Jersey recorded the highest number of antisemitic incidents at non-Jewish K–12 schools of any state. A true and correct copy of the ADL's 2025 Audit of Antisemitic Incidents report is attached hereto as Exhibit J.

40. Superintendent Spencer's statement about the October 7th Attack prompted Mr. Kaplan and many other parents to participate at the Board's public meeting on October 18, 2023 (the "October 18th Meeting") to express concerns regarding antisemitism in the community and schools. While many attendees, including Mr. Kaplan, were critical of Superintendent Spencer's statement, other attendees expressed support for Superintendent Spencer's statement.

41. The Board, however, repeatedly cut off commenters who described Hamas's actions to underscore why they found Superintendent Spencer's statement an inadequate condemnation of the October 7th Attack, citing a purported decorum rule banning use of "graphic language."

42. The Board at the time had no published rule against "graphic language" but appeared to implement such rule as an informal practice.

43. Yet, the Board refrained from cutting off speakers who used similar, if not identical, "graphic language" while expressing a contrary viewpoint.

44. For instance, one speaker said, "You can condemn Hamas unequivocally and you can condemn those actions unequivocally without taking a side in the conflict or even touching

the overall conflict, unless of course you're trying to appease people who actually think that the raping and murdering and pillaging of the community is appropriate." Board Vice President Fisher immediately interjected, "Excuse me we have an audience with children and students so I just ask that speakers be respectful of that audience. We're aware of the news."[2]

45.    Another speaker asked rhetorically, "How would you feel if indigenous people in our country came into your homes at 6 a.m., at 7 a.m., and pulled your kids out of their beds and then shot you in front of them?" Board Vice President Fisher interjected, "I'm going to remind you that there are students and children," adding that "facts don't need to be repeated, they're on the record."[3]

46.    Another speaker taking issue with the neutrality of Superintendent Spencer's statement said, "Terrorism is not neutral. Beheading babies, tying them together, shooting them between their eyes, that's not neutral. Raping women, that's not neutral." Board Vice President Fisher cut off the speaker.[4]

47.    Another speaker, responding to Superintendent Spencer calling the attack an "unfortunate situation in the Middle East," said, "Missing the bus is an unfortunate situation. Hanging babies from a shower rod and shooting them between the eyes is not an unfortunate situation." Board Vice President Fisher interrupted her and said, "There is no need to reiterate those details." Board President Rodriguez added, "Alright, we're either going to follow the rules or we're going to end this right now."[5]

48.    Mr. Kaplan, then proceeded to deliver his comment calling for a revised statement,

---

[2] Teaneck Board of Education, October 18, 2023 Regular Public Meeting, EDUVISION (Oct. 19, 2023), at 16:55, https://bit.ly/3Rankfn.
[3] *Id.* at 50:16.
[4] *Id.* at 54:35.
[5] *Id.* at 1:21:57.

stating, "This is the week to talk about the savagery, the inhumanity that was perpetrated by a terrorist group on innocent civilians who were butchered, who were raped, who were mutilated, who were beheaded, and worse," before Board Vice President Fisher cut him off for not following the "ground rules" while the clock continued running.

49.    Mr. Kaplan continued, "Imagine for a moment these heinous acts were committed by any group in any other place. Raping, butchering, beheading, setting aflame some thousand people." Board President Rodriguez interrupted with 43 seconds left on the clock, "Can we stop?"

50.    Mr. Kaplan continued, "Imagine any politician anywhere responding to those acts, those outrageous crimes, calling them incidents in a cycle of violence. You are noncommittal. It begs the question as to whether our schools operate in a value-free zone — a value-free zone where torture and rape are relative." Board President Rodriguez interrupted with 10 seconds left on the clock, "You need to stop now," directing the Board to cut off the microphone, as law enforcement approached Mr. Kaplan to remove him from the lectern. [6]

51.    As Mr. Kaplan placed his arms together in a handcuff gesture, upon information and belief, Board Member Denise Sanders screamed, "Don't satisfy him! Bye!"

52.    Moments later, Board Vice President Fisher screamed, "Keep your politics out of it!" and Board President Rodriguez interjected "Okay, Victoria" with a hand gesture for her to end the interaction.[7]

53.    While Board Vice President Fisher's initial interruption of Kaplan was purported to be in response to his use of "graphic language," her final outburst indicated otherwise, a disapproval of Mr. Kaplan's viewpoint.

---

[6] *Id.* at 1:49:57.
[7] *Id.*

10

54.     Mr. Kaplan believes the Board acted in bad faith when cutting his time short and that he had the right to finish his comment. However, to preserve decorum, he complied with law enforcement to leave the lectern at the October 18th Meeting.

55.     Several times during the meeting, Board President Rodriguez said the meeting was a "forum for decency" and directed commenters to not make "graphic comments."[8] Yet several commenters who supported Superintendent Spencer's statement—or criticized it for not sufficiently acknowledging the plight of Palestinians— were uninterrupted when using (or repeating others') language about murder, killing of children, rape, war, and genocide.

56.     For example, the Board allowed a speaker to say, interrupted, "These people talking about raping and piling bodies on top of each other, that happened in the Holocaust. And if they're having PTSD for what they're doing to the Muslim community in Palestine, that's something they need to seek mental health counseling for."[9]

57.     The Board also allowed a speaker, uninterrupted, to reference Israel's "dehumanizing and genocidal actions" and that the "propaganda surrounding them have spread all the way to us, where kids are stabbed 26 times just for being Palestinian, where women are run over just for wearing a hijab."[10]

58.     The Board also repeatedly told speakers to refrain from repeating details "on the record" or mentioned by others, but permitted other speakers to repeat previous statements on subjects such as the killing of a woman wearing hijab and Israel cutting off food, water, and electricity to Gaza.

59.     One speaker said, uninterrupted, "Israel is preparing its ground invasion of Gaza

---

[8] *Id*. at 1:26:08 and 2:30:50.
[9] *Id.* at 33:17.
[10] *Id*. at 46:58.

and indiscriminately bombing Palestinians killing thousands including many children. . . . Will you call this 'human rights' when they're cutting all the water and the basic necessity [of] the Palestinians? . . . I'm not going to say and repeat like everyone else the mother that witnessed her 6 years old being killed in front of her, the college student who was in critical condition in St. Joseph . . . . But the woman that had to die simply by walking on the sidewalk because she had a hijab on, she's Muslim."[11]

60.     Another speaker commented, uninterrupted, "After the people of Gaza have been cut off from food, water, and electricity in violation of international law, Teaneck speaks now and is quick to introduce a resolution that further dehumanizes the Palestinians."[12]

61.     Another speaker echoed these sentiments, uninterrupted, stating, "What's happened to the Palestinian people is genocide. We need to call it what it is. To deny people food, water, electricity, is to condemn them to death. To bomb their hospitals."[13]

62.     Defendants' actions on October 18, 2023 demonstrate selective enforcement of purported public comment rules against speakers based on their viewpoints.

63.     Upon information and belief, Defendants maintained an informal policy, practice, or custom of selectively enforcing "decorum," "graphic language," and similar vague and overbroad restrictions in a manner that disproportionately targeted speakers who criticize District officials and policies, while permitting similar language when used by speakers expressing favored viewpoints.

64.     Defendants' restrictions were not reasonable in light of the purpose of the Board meetings, which is to provide citizens with an opportunity to engage in public discourse concerning

---

[11] *Id.* at 1:41:14.
[12] *Id.* at 2:42:27.
[13] *Id.* at 2:53:28.

education affairs and District governance.

65.    Mr. Kaplan's comments did not constitute true threats, incitement, obscenity, or otherwise unprotected speech.

66.    Mr. Kaplan's comments were relevant to matters before the Board, were delivered during the allotted public-comment period, and within the three-minute assigned time limit, despite numerous interruptions from the Board.

### C. The Board Sends a Cease-and-Desist Letter to Mr. Kaplan

67.    Teaneck School District Policy 0174 authorizes the Superintendent and Board President to engage and seek the advice of legal counsel. It states, in pertinent part:

> The Board of Education authorizes the Superintendent of Schools, Superintendent of Schools' designee, School Business Administrator/Board Secretary, Board President, and Director of Specialized Education as designated contact persons to request services or advice from contracted legal counsel.

68.    On November 15, 2023, counsel for the Board at the time, Mark Tabakin, Esquire ("Tabakin"), from the Weiner Law Group, sent a letter (the "November 15th Letter") to Mr. Kaplan by way of email and certified mail, return receipt requested, on behalf of the Board, claiming Mr. Kaplan's conduct at the October 18th Meeting was "disruptive and crossed the boundaries of constructive dialogue." A true and correct copy of the November 15th Letter is attached as Exhibit K.

69.    In the November 15th Letter, Tabakin said the Board "may prohibit profane or abusive language having no other purpose than to be threatening" and "will not allow any speaker to commandeer public participation for personal and/or private grievances that have no nexus to the school community."

70.    In the November 15th Letter, Tabakin further stated that public participation at

13

meetings "must be done in a manner that respects the rights and perspectives of others," disclaimed any viewpoint-based motives, insisting that the "overtly aggressive and threatening" manner in which Mr. Kaplan "comported" himself was an "imminent disruption," and threatened to remove and/or ban Mr. Kaplan from future meetings if he violated the Board's "decorum guidelines" again. Superintendent Spencer, Board President Rodriguez, and Board Vice President Fisher were copied on the letter.

71.     Upon information and belief, the November 15th Letter was sent at the request of Superintendent Spencer and Board Member Williams pursuant to their authority under Teaneck School District Policy 0174.

72.     Upon information and belief, no other attendees at the October 18th Meeting received a similar letter.

73.     Mr. Kaplan was shocked to receive the November 15th Letter, given the commentary of many other speakers who echoed his sentiments and delivery. Despite frequently speaking at Board meetings, this was the first letter of this kind he has ever received from the Board.

74.     While Mr. Kaplan candidly admits his comments and delivery at the October 18th Meeting were impassioned, he categorically denies any allegations that he was disruptive or threatening in any way.

75.     Mr. Kaplan did not make any threatening statements or gestures, nor did Tabakin's letter reference any examples of his supposed threatening behavior, other than stating he was "screaming and yelling."

76.     Mr. Kaplan did not raise his voice any louder than many of the other attendees who delivered impassioned comments or Board Vice President Fisher herself.

14

77.     Mr. Kaplan construed the November 15th Letter as pretextual retaliation by Defendants for him exercising his speech rights. He construed this letter to be a credible threat that he would be prevented from participating in future public meetings based upon speech critical of district officials and policies, thereby chilling his exercise of his speech rights.

78.     The November 15th Letter would chill a person of ordinary firmness from exercising speech rights.

### D.  Mr. Kaplan is Forced to Leave the May 15, 2024 Board Meeting

79.     On May 15, 2025, following the conclusion of the public-comment portion of the meeting, and during a period in which only Board members were permitted to speak, Board Vice President Fisher singled out an attendee and shouted, "You sir are a bigot!"[14]

80.     Upon information and belief, Board Vice President Fisher's statement was directed at the attendee in response to comments he had made during public comment concerning antisemitic bullying within the District and the potential impact such conditions could have on student enrollment and District test scores. [15]

81.     Board Vice President Fisher's outburst prompted a heated exchange with the attendee and another individual, after which the meeting was temporarily recessed.

82.     While waiting in the hallway for the meeting to reconvene, Mr. Kaplan spoke with the attendee whose comments had prompted Board Vice President Fisher's remarks.

83.     Shortly thereafter, local police officers approached Mr. Kaplan and the attendee and informed them that they were required to leave the building because the Board had instructed law enforcement to "clear the building."

---

[14] Teaneck Public Schools, May 15, 2024 Regular Public Meeting, EDUVISION (May 16, 2024), at 2:03:21, https://teaneckschools.eduvision.tv/default?q=X3Y5NcZVhaADenkKrj6GIA%253d%253d.
[15] *Id*. at 1:16:03.

15

84.     Mr. Kaplan replied that the meeting had not been formally adjourned. Nevertheless, he and the attendee left the premises pursuant to the officers' instructions.

85.     Upon information and belief, Defendants thereafter resumed the meeting after Mr. Kaplan and the attendee had departed, without notifying them that the meeting had reconvened, thereby depriving Mr. Kaplan of the opportunity to deliver his intended public comment on district matters.

86.     Defendants' actions interfered with Mr. Kaplan's rights to engage in protected speech, petition governmental officials, and participate in public assembly concerning matters of community concern.

E.   **Mr. Kaplan is Cut Off from the September 25, 2025 Board Meeting**

87.     During a Board meeting held on September 25, 2025 (the "September 25th Meeting"), the Board established two separate public-comment periods. Attendees wishing to address Superintendent Spencer's contract renewal were directed to speak during the second comment session, while all other comments were restricted to the first session.

88.     During the first public-comment period, Mr. Kaplan addressed the Board remotely by way of Zoom regarding the adequacy of notice provided for Board meetings, including the instant meeting concerning Superintendent Spencer's proposed contract renewal. Mr. Kaplan's remarks concerned compliance with New Jersey public-meeting requirements and the validity of actions taken at meetings conducted without proper public notice.

89.     Although his comments addressed matters of governmental procedure and public concern, the Board interrupted and cut off Mr. Kaplan's Zoom feed before he completed his remarks and prevented him from continuing to speak.

90.     While Mr. Kaplan was permitted to speak during the second session, he refrained

16

from giving the comment he intended to deliver since he felt it was pointless to deliver this comment after a vote already occurred.

91.    Defendants' actions interfered with Mr. Kaplan's ability to address governmental officials regarding matters of public concern and for others to hear his comment.

**F.    The Ongoing Chilling Effect of Defendants' Actions on Mr. Kaplan's Speech**

92.    Given the Board's interpretation and enforcement of public comment rules and guidelines, the verbal warnings and expulsions at prior meetings, and the November 15th Letter he received from Tabakin, Mr. Kaplan now self-censors when he attends meetings out of concern he will be banned from future meetings. He intends to continue attending meetings in the future.

93.    For example, when the Board implemented the ban against naming individual district employees, he refrained from delivering a public comment that he otherwise would have, despite believing such a policy is unconstitutional, out of fear of losing his ability to attend public meetings.

94.    Mr. Kaplan has a justifiable concern that the Board will scrutinize his speech and delivery and use it as grounds to justify banning his attendance at future Board meetings. This would create a substantial hardship for him to meaningfully participate in Teaneck civic discourse both as a resident and a reporter for Teaneck Today.

95.    This concern is, has been, and continues to hinder Mr. Kaplan in exercising his speech, petition, and assembly rights.  But for the Defendants' actions, Mr. Kaplan would have delivered certain public comments which he refrained from and engaged Board officials more candidly in discourse aimed at accountability and transparency for the benefit of himself and other Teaneck residents.

96.    The repeated interruption, silencing, exclusion, and disparate treatment directed

toward Mr. Kaplan across multiple Board meetings reflects a policy, practice, or custom of targeting him because of his critical reporting and public comments concerning the Board and District administration.

97. Defendants' actions chill and continue to chill not only Mr. Kaplan's speech, but similarly situated individuals, from engaging in protected expression.

98. Defendants' frequent attempts to interrupt, silence, and exclude Mr. Kaplan from participation at multiple Board meetings caused him embarrassment and loss of reputation in the Teaneck community.

99. Defendants acted intentionally, knowingly, recklessly, and/or with deliberate indifference to Mr. Kaplan's constitutional rights.

100. Despite being placed on repeated written notice on at least three occasions by FIRE that the Board's public comment policies and enforcement practices were unconstitutional and resulted in viewpoint discrimination of critical speakers, the Board failed to take corrective action. Instead, the Board declined free offers of assistance to bring its policies into constitutional compliance and thereafter adopted and enforced additional restrictions that further burdened and chilled critical speech.

101. The Board was put on notice, refused to cure, and subsequently escalated restrictive rules, demonstrating that the Board knowingly acquiesced in, and was deliberately indifferent to, ongoing First Amendment violations, and that its policies and practices were maintained with awareness of their likely viewpoint-discriminatory effects.

102. The Board's repeated expansion of its public comment restrictions within a relatively short period following notice of unconstitutionality, combined with its enforcement of vague, arbitrary, and overbroad "decorum" and "graphic language" restrictions, further

18

demonstrates that the Board maintained an informal policy or custom of selectively enforcing speech restrictions in a manner that disproportionately burdened critical speakers.

103.    The acts and omissions of the individually named Defendants, including John Does (1–25), were undertaken pursuant to, authorized by, ratified by, and/or consistent with policies, practices, customs, or usages of the Board governing the regulation of speech and public participation at Board meetings.

104.    At all relevant times, the Board, through its final policymakers, was aware that its public comment restrictions and enforcement practices were subject to constitutional challenge and had been specifically identified as likely violating First Amendment viewpoint neutrality requirements. Despite this knowledge, the Board failed to implement adequate training, supervision, or corrective safeguards, and instead continued to enforce and refine discretionary restrictions that permitted arbitrary and viewpoint-based suppression of speech.

**FIRST COUNT**
**First Amendment Viewpoint Discrimination**
**42 U.S.C. § 1983 (Against All Defendants)**

105.    Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

106.    The First Amendment prohibits government officials from engaging in viewpoint discrimination in a limited public forum, including public comment periods at Board meetings. Defendants, acting under color of state law, enforced public comment rules and informal "decorum" standards in a manner that was not viewpoint neutral.

107.    Defendants interrupted, terminated, and curtailed Mr. Kaplan's speech and the speech of others expressing criticism of District officials and policies, while allowing similar language when used by speakers expressing favored viewpoints.

19

108.    Defendants' enforcement of speech restrictions was not reasonable in light of the purpose of the forum and was applied in a viewpoint discriminatory manner.

109.    As a result of Defendants' conduct, Mr. Kaplan was deprived of rights secured by the First and Fourteenth Amendments.

### SECOND COUNT
### First Amendment Retaliation
### 42 U.S.C. § 1983 (Against All Defendants)

110.    Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

111.    Mr. Kaplan engaged in constitutionally protected speech on matters of public concern, including criticism of Defendants and District policies at public meetings.

112.    Defendants took adverse actions against Mr. Kaplan including, but not limited to, interrupting and ending his comment time, removing him from a meeting, threatening exclusion from future meetings, and causing law enforcement to remove him from the lectern.

113.    Mr. Kaplan's protected speech was a substantial or motivating factor in Defendants' actions.

114.    The challenged conduct would deter a person of ordinary firmness from continuing to engage in protected speech, and in fact, did chill Mr. Kaplan's speech.

115.    Defendants' actions were unreasonable under the circumstances and undertaken in retaliation for protected expression.

116.    As result of Defendants' retaliatory conduct, Mr. Kaplan suffered constitutional injury, including the chilling of protected speech.

**THIRD COUNT**
**Monell Liability (Policy, Practice, or Custom)**
**42 U.S.C. § 1983 (Against Teaneck Board of Education)**

117. Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

118. Defendant Board of Education is a municipal entity subject to liability under 42 U.S.C. § 1983 where constitutional violations result from official policy, practice, or custom.

119. Board President Rodriguez and Board Vice President Fisher were final policymakers in connection with the public comment period during Board meetings.

120. Both Superintendent Spencer and Board Member Williams were final policymakers in connection with engaging and managing legal representation for the Board.

121. Mr. Kaplan's constitutional injuries were caused by one or more of the following:

   a. an official policy governing public comment that vests unbridled discretion in Board officials to interrupt, cut off, or restrict speech based on vague, overbroad, and subjective criteria such as "decorum," "disruptive," "inflammatory," or "graphic" language;

   b. an informal policy, practice, or custom of selectively enforcing public comment restrictions in a viewpoint-discriminatory manner;

   c. deliberate indifference to known First Amendment violations following repeated notice; and/or

   d. ratification by final policymakers of unconstitutional enforcement practices.

122. Defendants were placed on repeated written notice by FIRE that their public comment policies and enforcement practices were constitutionally defective and resulted in viewpoint discrimination.

21

123.    Despite such notice, Defendants failed to take corrective action and instead maintained, enforced, and expanded restrictive public comment rules.

124.    The sequence of notice, failure to correct, and subsequent escalation of restrictions demonstrate deliberate indifference to ongoing First Amendment violations.

125.    The identified policy, practice, or custom was the moving force behind the deprivation of Mr. Kaplan's constitutional rights.

126.    Mr. Kaplan suffered damages as a direct result of the deprivation of his constitutional rights including, but not limited to, embarrassment and loss of reputation.

## FOURTH COUNT
### First Amendment – Vagueness
### 42 U.S.C. § 1983 (Against All Defendants)

127.    Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

128.    The First and Fourteenth Amendments prohibit enforcement of vague policies that fail to provide persons of ordinary intelligence fair notice of what speech is prohibited and permit arbitrary and viewpoint discriminatory enforcement.

129.    Defendants maintain and enforce policies and practices governing public comment that include vague and subjective terms such as "decorum," "disruptive," "abusive," "inflammatory," "vulgar," and "graphic language," without objective or defined standards. These terms vest unbridled discretion in Board officials to determine, on an ad hoc basis, when speech may be interrupted, curtailed, or cut off.

130.    The challenged policies fail to provide sufficient clarity to speakers and fail to meaningfully constrain enforcement discretion, thereby inviting arbitrary and viewpoint-based enforcement. The policies are unconstitutionally vague on their face.

22

131.    The challenged policies and practices deprived Mr. Kaplan of fair notice and permitted arbitrary enforcement in violation of the First and Fourteenth Amendments.

## FIFTH COUNT
### First Amendment - Overbreadth
### 42 U.S.C. § 1983 (Against All Defendants)

132.    Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

133.    The First Amendment prohibits enforcement of rules that are overbroad, such that they prohibit a substantial amount of protected speech relative to their legitimate sweep.

134.    Defendants maintain and enforce policies governing public comment that prohibit, restrict, or chill a substantial amount of protected speech, including speech on matters of public concern during public meetings.

135.    The challenged restrictions—including prohibitions on "disparaging," "inflammatory," "graphic," "abusive," or otherwise undefined categories of speech—reach far beyond any legitimate governmental interest in maintaining order or decorum.

136.    These policies prohibit a substantial amount of constitutionally protected expression at public Board meetings.

137.    The overbreadth of Defendants' policies chills speech by persons of ordinary firmness, including Mr. Kaplan, who has self-censored and refrained from engaging in otherwise protected speech. Accordingly, the challenged policies are facially invalid under the First Amendment.

138.    The challenged policies substantially burden and chill protected expression in violation of the First Amendment.

**SIXTH COUNT**
**First Amendment – Petition and Assembly**
**42 U.S.C. § 1983 (Against All Defendants)**

139.   Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

140.   The First Amendment protects the rights of individuals "to petition the Government for a redress of grievances" and to peaceably assemble, including the right to meaningfully participate in governmental proceedings open to the public.

141.   Board meetings at which members of the public are permitted to speak constitute a forum for the exercise of Petition Clause and Assembly Clause rights, including the right to address elected officials regarding matters of public concern.

142.   Defendants, acting under color of state law, interfered with Mr. Kaplan's rights to petition and peaceably assemble by arbitrarily and selectively:

    a.   terminating his public comment prior to the expiration of his allotted time;

    b.   silencing him while he was addressing matters of public concern;

    c.   removing him from Board meetings and directing law enforcement to exclude him from Board premises during or in connection with ongoing meetings; and

    d.   preventing him from completing or resuming his attempt to address the Board regarding District affairs.

143.   Defendants' actions were not viewpoint neutral or reasonable to maintaining order or conducting meetings. Instead, Defendants' conduct burdened and chilled Mr. Kaplan's ability to petition his government and to assemble for the purpose of expressing grievances regarding District policies and administration.

144.   As a result of Defendants' conduct, Mr. Kaplan was deprived of rights secured by

24

the First and Fourteenth Amendments, including the rights to petition the government and peaceably assemble.

## SEVENTH COUNT
### Violations of the New Jersey Constitution
### (Article I, Paragraph 6 – Free Speech; Paragraph 18 – Assembly and Petition)
### (Against All Defendants)

145.    Mr. Kaplan repeats and reasserts each and every allegation above as if fully set forth herein at length.

146.    The New Jersey Constitution guarantees robust protections for free speech, peaceable assembly, and the right to petition the government for redress of grievances under Article I, Paragraph 6 and Paragraph 18.

147.    These protections apply with full force to public meetings of governmental bodies, including public comment periods at Board of Education meetings, which constitute fora for civic participation and petitioning elected officials on matters of public concern.

148.    Defendants, acting under color of state law, enforced and maintained policies, practices, and customs governing public comment that vested Board officials with broad and subjective discretion to interrupt, curtail, or cut off speech based on vague and overbroad criteria.

149.    Defendants applied these policies and practices in a manner that was not viewpoint neutral and that disproportionately burdened and restricted critical speakers, including Mr. Kaplan, while permitting comparable or substantially similar speech when expressing a favored viewpoint.

150.    Defendants further interfered with Mr. Kaplan's rights to speak, assemble, and petition by interrupting and cutting off his public comment, removing him from meetings, and preventing him from completing participation in public proceedings.

151.    Defendants' actions were arbitrary, viewpoint-discriminatory, unreasonable in maintaining order or facilitating public meetings.

25

152.   As a result of Defendants' conduct, Plaintiff was deprived of rights secured by Article I, Paragraph 6 and Paragraph 18 of the New Jersey Constitution, including the rights to speak, petition the government, and peaceably assemble.

WHEREFORE, Mr. Kaplan respectfully requests Judgment in his favor, and against Defendants, as follows:

A.   An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing bylaws, guidelines, and rules requiring "reasonable decorum" and prohibiting speech deemed "vulgar," "inflammatory," "abusive," "disparaging," "otherwise inappropriate," "speaking negatively about an employee or a student" (and naming them);

B.   Declaratory relief consistent with the injunction, to the effect that the Board's speech prohibitions are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague and overbroad laws;

C.   Awarding compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial;

D.   Awarding nominal damages;

E.   Awarding punitive damages where applicable;

F.   Awarding all costs of suit, including reasonable attorneys' fees and expert costs provided by 42 U.S.C. § 1988 and other applicable law;

G.     Awarding pre-judgment and post-judgment interest as allowed by law;

H.     Awarding such other and further relief as may be equitable and just.

**JABLONSKY LEGAL LLC**
**d/b/a MADISON HOUSE LEGAL GROUP**

*s/ Stephanie Jablonsky*

By:_____

     Stephanie Jablonsky, Esq.
     124 West Washington Avenue, Suite 4
     Washington, NJ 07882
     609-831-2025
     Stephanie@MadisonHouseLegal.com

Dated: May 15, 2026

27

## DEMAND FOR JURY TRIAL

In compliance with Federal Rule of Civil Procedure 38, Mr. Kaplan demands a trial by jury on all issues so triable.

**JABLONSKY LEGAL LLC**
**d/b/a MADISON HOUSE LEGAL GROUP**

*s/ Stephanie Jablonsky*

By:_____
Stephanie Jablonsky, Esq.

Dated: May 15, 2026

## DESIGNATION OF TRIAL COUNSEL

Mr. Kaplan hereby designates **Stephanie Jablonsky** as trial counsel in this matter.

**JABLONSKY LEGAL LLC**
**d/b/a MADISON HOUSE LEGAL GROUP**

*s/ Stephanie Jablonsky*

By:_____
Stephanie Jablonsky, Esq.

Dated: May 15, 2026

28

**VERIFICATION**

KEITH KAPLAN, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. I have reviewed the Complaint and know the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

Keith Kaplan

Dated: May 15, 2026

28